UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Connie P.,

      Plaintiff,

      v.                                          Civil Action No. 2:22–cv–196–kjd

Commissioner of Social Security,

      Defendant.

## OPINION AND ORDER
(Docs. 10, 13)

Plaintiff Connie P. brings this action pursuant to 42 U.S.C. § 405(g) of the Social

Security Act, requesting review and remand of the decision of the Commissioner of Social

Security denying her applications for Supplemental Security Income (SSI) and Disability

Insurance Benefits (DIB).  Pending before the Court are Plaintiff's motion to reverse the

Commissioner's second decision (Doc. 10), and the Commissioner's motion to affirm the same

(Doc. 13).  For the reasons stated below, Plaintiff's motion is DENIED, the Commissioner's

motion is GRANTED, and the decision of the Commissioner is AFFIRMED.

## Background

Plaintiff was forty-five years old on her amended alleged disability onset date of

November 26, 2018.  (AR 177, 1144.)  She has a high school education, plus two years of

college and an associate's degree in early education and K through 12.  (AR 206, 1147, 1091.)

Plaintiff has held several jobs including as a substitute teacher in December 2019, a receptionist

from July to September 2019, a cashier at a convenience store from September to November

2018, a preschool teacher at a daycare center in June 2018, and a receptionist/office manager at

West Street Financial Services from 1995 until the company ceased operation in March 2018. (*See* AR 206–07, 213–14, 311, 316, 509, 1092–94, 1148–49.)  She lives with her husband in Rutland, Vermont.  (AR 34–35.)

Plaintiff suffers from degenerative disc disease, which causes pain primarily in her knees and lower back, and leg weakness.  She is morbidly obese, despite losing over 160 pounds after undergoing bariatric surgery in 2013.  (*See, e.g.*, AR 515, 661, 1582, 1593, 1924.)  On several dates between 2016 and 2021, Plaintiff underwent radiofrequency denervation procedures[1] on her lower spine (AR 640, 642, 652, 1495, 1501); and in November 2018, she underwent fusion surgery on her right sacroiliac joint[2] (AR 695, 700).  None of these procedures has relieved Plaintiff's pain, nor have epidural injections or physical therapy.  Since at least May 2016, Plaintiff has been prescribed opioids, including tramadol and oxycodone, to address her pain. (*See, e.g.*, AR 521, 661.)  By October 2021, Plaintiff's oxycodone prescription had increased threefold to one-to-two tablets every six hours, not to exceed seven tablets per day.  (AR 1402–03.)  Although the opioids reduce her pain, Plaintiff states that they leave her feeling tired and cognitively impaired.  (*See, e.g.*, AR 43, 1009, 1091, 1095.)

In a June 2019 Function Report, Plaintiff stated that she was unable to work due to her limitations in standing and walking; and because she "ha[d] a hard time leaving [her] house" due to anxiety and depression.  (AR 250.)  Although Plaintiff stated that she could sit for up to five hours a day "if in a proper office chair" (*id.*), she reported that she spent her days "mostly . . . in

---

[1]  Radiofrequency denervation is "a treatment for neck or back pain that comes from [the] facet joints. . . . The treatment uses radiofrequency waves to block nerves around the facet joints in [the patient's] back or neck that are causing pain."  Dr. Johann Emmanuel, Bupa ("British United Provident Association Limited"), https://www.bupa.co.uk/health-information/muscles-bones-joints/radiofrequency-denervation#:~:text=What%20is%20radiofrequency%20denervation%3F,neck%20that%20are%20causing%20pain (last visited June 27, 2023).

[2]  Sacroiliac joint fusion is a "minimally invasive procedure to stabilize an injured sacroiliac joint and relieve pain."  Yale Medicine, https://www.yalemedicine.org/conditions/sacroiliac-joint-fusion (last visited June 27, 2023).

bed with [her] legs elevated to [reduce her] pain" (AR 253), while watching television, reading, or playing computer games (AR 256).  She explained that she got out of bed only to do exercises to try to strengthen her back, knee, and hip; to help her husband with the daily housework including washing dishes if she was able; to care for her pets; to take a walk around her yard if she was able; to go shopping for groceries and other household items; to attend medical appointments; and to visit her mother.  (AR 253–56.)  Plaintiff stated that she did not like being in crowded places, but she was able to shop in stores for groceries and other household items "once in a while."  (AR 255.)  She further stated that although she "ha[d] no friends" (AR 256), she got along well with authority figures and had never been fired from a job due to problems getting along with others (AR 258).

In February 2020, Plaintiff testified at her initial administrative hearing that she was unable to sit for "too long" without her back hurting, that she could not stand for longer than about five or ten minutes because her knee "g[ave] out," and that she had a constant "electric shock[]" feeling in her right leg that was "very painful."  (AR 1150; *see* AR 1154.)  She further testified that she was only physically comfortable when she was in bed with her leg elevated above her heart.  (AR at 1151, 1153.)  Her daily activities as of February 2020 included: napping, reading, watching television, and talking on the telephone while in bed with her leg elevated (AR 1153); taking a shower or bath (AR 1152); and doing a small load of dishes "once in a while" if using an office chair to elevate her leg (AR 1152–53).

In May 2022, Plaintiff testified at her second administrative hearing that her condition had worsened since the initial hearing.  (AR 1094.)  She stated that she was using a walker to get around the house and required help getting to the bathroom.  (AR 1094–95.)  She further stated that she was receiving cortisone shots in both knees and taking five milligrams of opioids every four hours, which made her drowsy sometimes and resulted in her napping every afternoon.  (AR

1095.)  In response to a question from counsel about what Plaintiff had been doing about her weight, she stated that she had "sleeve surgery," which reduced her weight to approximately 230–250 pounds, but she said she was "not mobile at all, so the weight got put back on" and she weighed 320 pounds the last time she checked.  (AR 1096.)  On a typical day, Plaintiff stated that she lay in bed with her leg elevated.  (*Id.*)  She explained that it was difficult to sit in chairs because that put pressure on her lower back; she could sit for only about thirty minutes at a time and then she had to lie down for a couple hours; she did not stand at all; and if she stood for longer than ten or fifteen minutes, her knee would give out and she would fall.  (*Id.*)

Plaintiff filed her applications for DIB and SSI in August and September 2018, respectively, alleging that she is unable to work due to chronic back pain, arthritis, degenerative disc disorder, and radicular pain on the right side.  (AR 177, 179, 205.)  In February 2020, Plaintiff amended her alleged disability onset date to November 26, 2018, the date she had her sacroiliac fusion surgery.  (AR 1144–45; *see* AR 700.)  Plaintiff's applications were denied initially and on reconsideration, and she timely requested an administrative hearing.  On February 4, 2020, Administrative Law Judge (ALJ) Joseph Menard conducted the first of two hearings on Plaintiff's application.  (AR 29–48, 1140–59.)  Plaintiff appeared and testified and was represented by counsel.  A vocational expert also testified.  On February 20, 2020, the ALJ issued a decision finding that Plaintiff was not disabled under the Social Security Act from her amended alleged disability onset date through the date of the decision.  (AR 10–19.)  After the Appeals Council denied Plaintiff's request for review, Plaintiff filed a civil action.  (AR 1–3, 1128–30.)  On November 16, 2021, the District Court issued an order remanding the Commissioner's decision for further administrative proceedings pursuant to the assented-to motion of the Commissioner.  (AR 1131.)

After remand, ALJ Menard conducted a second administrative hearing. (AR 1069–

1101.) Plaintiff, represented by counsel, again appeared and testified, as did a vocational expert.

In addition, Justo Garcia, MD, testified as a medical expert. (AR 1074–91.) On June 28, 2022,

ALJ Menard issued a second unfavorable decision. (AR 1047–60.) Plaintiff did not file

exceptions to the decision and filed the Complaint in this action on October 25, 2022. (Doc. 1.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims. *See*

*Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004). The first step requires the ALJ to

determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R.

§§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to

determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c),

416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the

ALJ to make a determination as to whether that impairment "meets or equals" an impairment

listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d),

416.920(d). The claimant is presumptively disabled if his or her impairment meets or equals a

listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the

claimant's residual functional capacity (RFC), which means the most the claimant can still do

despite his or her mental and physical limitations based on all the relevant medical and other

evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).

The fourth step requires the ALJ to consider whether the claimant's RFC precludes the

performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If the

claimant cannot perform his or her past relevant work, at the fifth step the ALJ determines

whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The

claimant bears the burden of proving his or her case at steps one through four.  *Butts*, 388 F.3d at

383.  At step five, there is a "limited burden shift to the Commissioner" to "show that there is

work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306

(2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and

the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Menard first determined that Plaintiff had not

engaged in substantial gainful activity since November 26, 2018, her amended alleged disability

onset date.  (AR 1050.)  At step two, the ALJ found that Plaintiff had the following severe

impairments: degenerative disc disease, obesity, knee dysfunction, and asthma.  (*Id.*)

Conversely, the ALJ found that the following impairments were nonsevere: migraine headaches,

hypertension, hyperparathyroidism, neck pain, depressive disorder, and anxiety.  (AR 1050–51.)

At step three, the ALJ determined that none of Plaintiff's impairments, alone or in combination,

met or medically equaled a listed impairment.  (AR 1052–53.)

Next, the ALJ determined that Plaintiff had the RFC to perform "sedentary work," as

defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), "except that":

> [Plaintiff] can lift and carry up to 25 pounds occasionally and between up to 10 to
> 12 pounds frequently.  She has no sitting limitations.  She can stand for 30–45
> minutes at one time and up to 4–5 hours in a workday.  She can walk 15–20 minutes
> at a time and up to 60–90 minutes in a day.  [Plaintiff] can reach overhead
> bilaterally.  She can[]not climb more [than] one flight of stairs.  She can never climb
> ladders, ropes, or scaffolds.  [She] can frequently balance, stoop, kneel, crouch, and
> crawl.  [She] can have no more than frequent exposure to unprotected heights and
> moving mechanical parts.  She can have no more than frequent exposure to dust,
> fumes, odors, and other pulmonary irritants.  She can have no more than frequent
> exposure to extreme cold.  She cannot have any exposure to extreme heat and
> vibration.

(AR 1053.)  Given this RFC, the ALJ found that Plaintiff was capable of performing her past

relevant work as an office manager, as the job is generally performed.  (AR 1059–60.)  The ALJ

concluded that Plaintiff had not been under a disability from her amended alleged disability onset date of November 26, 2018, through the date of the decision.  (AR 1060.)

### Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his impairments "are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering the Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" in the record supports the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305.

The substantial evidence standard is "very deferential," and the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (internal quotation marks omitted); *see Sesa v. Colvin*, 629 F. App'x 30, 31 (2d Cir. 2015). Nonetheless, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Plaintiff argues that the ALJ erred in his analysis of the opinions of testifying medical expert Dr. Garcia and treating provider Nurse Practitioner (NP) Susan Dumas. (*See* Doc. 10.) Specifically, Plaintiff claims the ALJ should have found persuasive Dr. Garcia's and NP Dumas's opinion that Plaintiff's pain and use of opioid medications limited her ability to concentrate. Moreover, Plaintiff asserts that the ALJ improperly cherry-picked the medical evidence, ignored relevant medical findings, mischaracterized the record regarding the side effects Plaintiff experienced from her use of opioids, and ignored Dr. Garcia's testimony that Plaintiff should be limited to "simple" office work. According to Plaintiff, had the ALJ properly considered the record and analyzed the medical opinions of Dr. Garcia and NP Dumas, he would have included in his RFC determination a limitation to accommodate Plaintiff's reduced ability to concentrate, which would have resulted in a finding of disability. Plaintiff seeks remand solely for calculation of benefits.

The Commissioner responds that the ALJ did not err in finding Dr. Garcia's opinions about Plaintiff's physical limitations more persuasive than NP Dumas's, and substantial evidence supports the ALJ's finding that Plaintiff did not have significant deficits in concentration. (*See* Doc. 13.) The Commissioner therefore argues that the Court should affirm the ALJ's decision and decline to remand for a calculation of benefits.

## I.  Legal Standards for Consideration of Medical Opinions

Because Plaintiff's claim was filed after March 2017,[3] the regulations require that the

ALJ consider the medical opinions in the record based on the following five factors: (1) whether

the opinion is supported by objective medical evidence and supporting explanation; (2) whether

the opinion is consistent with evidence from other medical and nonmedical sources; (3) the

medical source's relationship with the claimant, including the length of treatment, frequency of

visits, purpose for treatment, kinds and extent of examination and testing performed or ordered,

and whether the source examined the claimant or merely reviewed the evidence; (4) whether the

source has advanced education and training in the relevant area of specialty; and (5) "other

factors that tend to support or contradict a medical opinion."  20 C.F.R. §§ 404.1520c(c),

416.920c(c); *see id.* §§ 404.1520c(b), 416.920c(b).  Among these factors, the "most important"

in "evaluat[ing] the persuasiveness of medical opinions" are "supportability" and "consistency."

---

[3]  For social security claims filed before March 27, 2017, the Social Security Administration's regulations mandated application of the "treating physician rule," which required an ALJ to give more weight to the opinions of "treating sources," meaning medical sources who provided the claimant with medical treatment or evaluation and had an ongoing treatment relationship with the claimant, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (holding that the Social Security Administration "recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant" (internal quotation marks omitted)); *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) ("The [regulations] give[] special evidentiary weight to the opinion of the treating physician.").  Under the treating physician rule, an ALJ was required to "give good reasons" if he determined that a treating source's opinion was not entitled to either "controlling weight" or, at least, "more weight" than the opinions of non-treating and non-examining sources, 20 C.F.R. §§ 404.1527(c)(1)–(2), 416.927(d)(1)–(2), and a consultative physician's opinion was generally entitled to "little weight," *Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009).  On January 18, 2017, the Social Security Administration published comprehensive revisions to the regulations regarding the evaluation of medical evidence for applications filed on or after March 27, 2017.  *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844, 5869-70, 2017 WL 168819 (Jan. 18, 2017).  In implementing these new regulations, the Social Security Administration "has apparently sought to move away from a perceived hierarchy of medical sources."  *Velasquez v. Kijakazi*, 19cv9303 (DF), 2021 WL 4392986, at *19 (S.D.N.Y. Sept. 24, 2021) (citing 82 Fed. Reg. 5844).  The new regulations state that an ALJ need "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . , including those from [a claimant's] medical sources."  20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Instead, an ALJ must consider all medical opinions in the record and "evaluate the[ir] persuasiveness," 20 C.F.R. §§ 404.1520c(a), 416.920c(a), based on the five factors listed *infra*, *id.* §§ 404.1520c(c), 416.920c(c).

*Id.* §§ 404.1520c(a), 416.920c(a); *see id.* §§ 404.1520c(b), 416.920c(b); *Amber H. v. Saul*, 3:20-

CV-490 (ATB), 2021 WL 2076219, at *4 (N.D.N.Y. May 24, 2021) (noting that "[t]he two most

important factors for determining the persuasiveness of medical opinions are consistency and

supportability, which are the same factors that formed the foundation of the treating source rule"

(internal quotation marks omitted)).

Notwithstanding the requirement to consider these factors, the ALJ's duty to articulate a

rationale for each factor varies. *See id.* §§ 404.1520c(a)–(b), 416.1520c(a)–(b).  In all cases, the

ALJ must explain "how [he] considered" the supportability and consistency factors.  *Id.* §§

404.1520c(b)(2), 416.920c(b)(2).  With respect to the supportability factor, "the strength of a

medical opinion increases as the relevance of the objective medical evidence and explanations

presented by the medical source increase."  *Vellone v. Saul*, 1:20-cv-00261 (RA) (KHP), 2021

WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021) (citing 20 C.F.R. §§ 404.1520c(c)(1),

416.920c(c)(1)); *see Rivera v. Comm'r of Soc. Sec.*, 19-CV-4630 (LJL) (BCM), 2020 WL

8167136 (S.D.N.Y. Dec. 30, 2020), at *16 (noting that supportability "has to do with the fit

between the medical opinion offered by the source and the underlying evidence and explanations

'presented' by that source to support her opinion" (quoting 20 C.F.R. § 416.920c(c)(1))).  As for

the consistency factor, the greater the consistency between a particular medical opinion and the

other evidence in the record, the more persuasive that opinion is.  *Vellone*, 2021 WL 319354, at

*6 (citing 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(3)) (noting that the consistency factor "is

an all-encompassing inquiry focused on how well a medical [opinion] is supported, or not

supported, by the entire record").  While the ALJ is required to consider the three remaining

factors—including the medical source's specialization and relationship with the claimant, and

any "other factors"—there is no requirement that the ALJ explicitly discuss these factors in

determining the persuasiveness of the opinion of a medical source.  *See* 20 C.F.R. §§

404.1520c(b), 416.920c(b)(2).

Accordingly, "[a]lthough the new regulations eliminate the perceived hierarchy of

medical sources, deference to specific medical opinions, and assigning 'weight' to a medical

opinion[;] the ALJ must still 'articulate how [he or she] considered the medical opinions' and

'how persuasive [he or she] find[s] all of the medical opinions.'"  *Andrew G. v. Comm'r of Soc.*

*Sec.*, 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020) (third, fourth, and

fifth alterations in original) (quoting 20 C.F.R. §§ 404.1520c(a) and (b)(1), 416.920c(a) and

(b)(1)).  If the ALJ fails to adequately explain the supportability or consistency factors, remand is

required.  *See, e.g., id.* at *5–9; *see also Rivera*, 2020 WL 8167136, at *14–17.  District courts in

this Circuit that have considered the new regulations regarding ALJ evaluation of medical source

opinions have concluded that "the factors are very similar to the analysis under the old [treating

physician] rule," *Velasquez*, 2021 WL 4392986, at *20 (alteration in original) (quoting *Dany Z.*

*v. Saul*, 531 F. Supp. 3d 871, 885 (D. Vt. 2021)), and that the "essence" of the treating physician

rule "remains the same, and the factors to be considered in weighing the various medical

opinions in a given claimant's medical history are substantially similar," *Acosta Cuevas v.*

*Comm'r of Soc. Sec.*, 20-CV-0502 (AJN) (KHP), 2021 WL 363682, at *9 (S.D.N.Y. Jan. 29,

2021), *report and recommendation adopted*, 2022 WL 717612 (Mar. 10, 2022).  As one court

explained, "[t]his is not surprising considering that, under the old rule, an ALJ had to determine

whether a treating physician's opinion was *supported* by well-accepted medical evidence and *not*

*inconsistent* with the rest of the record[,] before controlling weight could be assigned."  *Acosta*

*Cuevas*, 2021 WL 363682, at *9.  This court has reached a similar conclusion.  "Even though

ALJs are no longer directed to afford controlling weight to treating source opinions—no matter

how well supported and consistent with the record they may be—the regulations still recognize

the foundational nature of the observations of treating sources, and consistency with those observations is a factor in determining the value of any [treating source's] opinion." *Shawn H. v. Comm'r of Soc. Sec.*, Civil Action No. 2:19-cv-113, 2020 WL 3969879, at *6 (D. Vt. July 14, 2020) (alteration in original) (internal quotation marks omitted).

## II.     ALJ's Review of the Medical Opinions

### A.     Physical Limitations

Dr. Garcia was not one of Plaintiff's treating medical sources.  Rather, he was called as a medical expert to testify at the second administrative hearing (AR 1074–1091), after review of Plaintiff's medical records (AR 1075).  Dr. Garcia testified that Plaintiff's main impairment is "musculoskeletal disorders" related to her long history of back pain.  (*Id.*)  He noted that Plaintiff also has knee pain and a history of obesity, depression, migraines, and hypertension.  (AR 1075–76.)  Dr. Garcia observed that, according to neurosurgeon Dr. Joseph Phillips, imaging reports do not correlate with the severity of Plaintiff's symptoms.  (AR 1077.)  Dr. Garcia further noted that Plaintiff is "borderline morbidly obese," opining that this is "a huge factor that contributes to [her] pain."  (AR 1076.)

In relevant part, Dr. Garcia opined as follows regarding Plaintiff's physical limitations: she can do no more than "walk slowly" for a maximum of fifteen or twenty minutes (AR 1081); she can climb at most two flights of stairs (*id.*); she can lift no more than twenty-five pounds occasionally and ten to twelve pounds frequently (AR 1082); she may have "some limitations" in sitting during periods when her pain is exacerbated (*id.*); she can stand for between thirty and forty-five minutes at one time and for no more than "four or five hours" in an eight-hour workday (AR 1083); and she can walk for no more than sixty to ninety minutes in an eight-hour workday (*id.*).  Dr. Garcia noted that, for more than two years, Plaintiff has been using opioids, and, "in [his] opinion, [they are] not helping her because . . . [she] may have some degree of

dependence on opioids."  (AR 1080.)  He explained that long-term use of opioids "can cause disruption in concentration," and that "when patients use opioids[,] their mental awareness . . . is less accurate."  (AR 1089.)  He opined that Plaintiff would "occasionally" be sedated more than a normal patient if using opioids and "would have problems concentrating," along with potential problems with abdominal pain, vomiting, and constipation.  (*Id.*)  In response to a question asking what percentage of time Plaintiff might be off task because of the above problems and whether she would have "the concentration for simple work," Dr. Garcia stated: "I don't want to say that she cannot do anything," but "it depends on the time that she takes the medications." (*Id.*)  He further stated that Plaintiff could do "some office work," but he "would not recommend her to do more than simple office work."  (AR 1088.)  Dr. Garcia believed that Plaintiff would have "some issues with concentration," but he was "not fully able to say the extent of those [issues]" based on what he had reviewed.  (AR 1091.)

The ALJ reviewed Dr. Garcia's opinions as required under the new regulations, chiefly considering their supportability and consistency with the record.  *See* 20 C.F.R. § 404.1520c(a) ("The most important factors we consider when we evaluate the persuasiveness of medical opinions . . . are supportability and consistency." (citations omitted)).  The ALJ concluded that Dr. Garcia's opinions regarding Plaintiff's physical limitations were "most persuasive," because they were "largely consistent with and supported by the medical evidence of record."[4]  (AR 1057.)  The ALJ explained: "Dr. Garcia was able to cite to specific objective findings to support his opinion[s], he had the opportunity to review the entire medical record, and he was available

---

[4]  Although the ALJ found that Plaintiff has "no sitting limitations" (AR 1053) and Dr. Garcia arguably testified that Plaintiff has "*some* [sitting] limitations" (AR 1082 (emphasis added)), there is no material difference in opinion here, because Dr. Garcia's testimony could reasonably be read to opine that Plaintiff was not limited in her ability to sit.  Specifically, Dr. Garcia initially testified that he "do[es] not] see limitations with sitting"; he then added that Plaintiff would be limited in her ability to sit only when she had "exacerbation of pain"; and finally, he stated that "sitting will be something that [Plaintiff] . . . can do."  (*Id.*)

for cross examination." (AR 1058.) More specifically, the ALJ noted that imaging did not show any stenosis or nerve root compromise consistent with Plaintiff's radicular symptoms; and that although examinations showed limited back and knee motion with an antalgic gait at times, Plaintiff "did not often display any motor loss, sensation loss, or abnormal reflexes." (*Id.*) The record supports these findings. Regarding imaging, as Dr. Garcia testified, Dr. Phillips stated in a February 2022 treatment note that Plaintiff's CAT scan looked "remarkably good" and her MRI scan showed "an excellent looking spine with nice, open foramina at 4-5 and 5-1." (AR 1484.) Dr. Phillips further stated that the imaging "certainly doesn't give us an assurance or data that would support radiculopathy on the basis of something we could change." (*Id.*)

The record also supports the ALJ's observation that clinical findings were largely benign. For example, Plaintiff's progress notes usually revealed no neurological deficits other than limb weakness and difficulty walking, which are accounted for in the ALJ's RFC determination (*see, e.g.*, AR 694, 697, 726, 944, 973, 980, 984, 1513, 1926, 2027), full motor strength and range of motion in the extremities (*see, e.g.*, AR 520, 695, 726, 1513, 1541, 1926, 2027, 2218), and intact sensation (*see, e.g.*, AR 695, 726, 1513, 1541). Moreover, several treatment notes state that Plaintiff was "able to rise [from] and return to a seated position without any difficulty." (AR 695; *see* AR 730 ("rises easily from the chair and walks normally").) Furthermore, Plaintiff herself stated in a March 2019 Function Report that she could stand for two to three hours at a time (AR 232), and in a June 2019 Function Report that she could sit for up to five hours at a time (AR 250).

The ALJ recognized that Plaintiff's examinations "often showed limited back and knee motion, with an antalgic gait at times" (AR 1058; *see, e.g.*, AR 1380, 1386, 1388), and also noted references in the record to Plaintiff having weakness and numbness in her legs (AR 1056 (citing AR 1378–80); *see, e.g.*, AR 1384–85). The ALJ accounted for these limitations in his

14

RFC determination, finding that Plaintiff was limited to work involving standing for only "30–45 minutes at one time and up to 4–5 hours in a workday," and walking for only "15–20 minutes at a time and up to 60–90 minutes in a day."  (AR 1053.)  The ALJ also recognized that Plaintiff "eventually started using a cane due to reported radicular pain and weakness in her right leg," but stated that "examinations in 2019 and 20[20] did not show significant weakness."  (AR 1055.)  A claimant who uses a cane is not precluded from sedentary work, as the ALJ found Plaintiff could do here.  *See, e.g.*, *Stover v. Saul*, 18-CV-00404-MJR, 2020 WL 897411, at *5 (W.D.N.Y. Feb. 25, 2020) ("[T]he use of a cane or walker to aid in ambulation is not inconsistent with an RFC of sedentary work."); *Christopher W. v. Saul*, Case No. 5:20-cv-41, 2021 WL 9680752, at *14 (D. Vt. Apr. 8, 2021) (same).  Despite the positive findings in the record, the ALJ reasonbly found that, on balance, the evidence did not support functional limitation "to the extent described by [Plaintiff]."  (AR 1056.)

Plaintiff asserts that the ALJ "cherry-picked" the evidence, relying only on those portions of the record that support nondisability and disregarding those that support disability.  (*See* Doc. 10 at 8.)  But the ALJ is not required to "reconcile explicitly every conflicting shred of medical testimony."  *Davila-Marrero v. Apfel*, 4 F. App'x 45, 46 (2d Cir. 2001) (internal quotation marks omitted).  Nor is the ALJ obliged to "identify evidence explicitly rebutting the opinions of [a claimant's] treating physicians before discounting or rejecting them."  *Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018).  Moreover, the fact that the record contains positive findings does not undermine the ALJ's RFC determination where there is also evidence to support that determination.  *See Davila-Marrero*, 4 F. App'x at 46.  As the Second Circuit has explained, "[w]hen there is substantial evidence to support either position, the determination is one to be made by the fact-finder, and [the court] will regard this determination as conclusive."  *Id.* (citation and internal quotation marks omitted); *see Barrere v. Saul*, 20-1102-cv, 2021 WL

1590047, at *2 (2d Cir. Apr. 23, 2021) ("Even though there is also evidence in the record to the contrary, . . . and even though an analysis of the substantiality of the evidence must also include that which detracts from its weight, [the court] defer[s] to the Commissioner's resolution of conflicting evidence, . . . [and therefore] we affirm the judgment [in favor of the Commissioner] because we agree that the ALJ's ruling is supported by substantial evidence." (citations and internal quotation marks omitted)).

As noted above, ALJ Menard acknowledged that the record documented that, at times, Plaintiff had an antalgic gait and reduced range of motion in her spine, along with other positive findings.  (AR 1056–58.)  But the ALJ also properly considered other evidence—including treatment notes documenting pain relief and full range of motion, the opinion of medical expert Dr. Garcia, the opinions of agency medical consultants, and Plaintiff's activities of daily living— and reasonably concluded that Plaintiff could still perform the job of office manager as that job is generally performed in the national economy.  *See Herrera v. Comm'r of Soc. Sec.*, 20-CV-7910 (KHP), 2021 WL 4909955, at *10 (S.D.N.Y. Oct. 21, 2021) (rejecting claim of cherry-picking, where ALJ "grappled with inconsistent records" and found an opinion "only somewhat persuasive"); *DeChirico v. Callahan*, 134 F.3d 1177, 1182–83 (2d Cir. 1998) (holding that where substantial evidence supported claimant's account "[b]ut there was also substantial evidence in the record from which the ALJ could have reasonably" found in favor of the Commissioner, court "cannot say that the ALJ's finding [against claimant] was unsupported on the record").

Regarding the opinions of agency medical consultants, based on their independent review of the record, nonexamining agency consultants Drs. Geoffrey Knisely and Cajsa Schumacher each opined that Plaintiff could sit for six hours and stand/walk for four hours in an eight-hour workday, and may require a two- to four-minute position change every hour.  (*See* AR 58, 90– 91.)  These limitations are partially more restrictive (regarding sitting, standing, and changing

positions) and partially less restrictive (regarding walking) than the limitations included in the

ALJ's RFC determination.  The ALJ did not fully adopt the opinions of Drs. Knisely and

Schumacher because he found them only "partially consistent with and supported by the medical

evidence of record," and because the consultants "did not have the opportunity to review the

entire medical record, including updated orthopedic evaluations and [Plaintiff's] response to

injections and other treatment."  (AR 1058.)  Substantial evidence, cited above, supports this

assessment.  Moreover, even if the ALJ had fully credited these opinions, his RFC determination

would be essentially the same, as the limitations contained in Dr. Knisely's and Dr.

Schumacher's opinions do not preclude Plaintiff from doing her past sedentary work as an office

manager.  *See* SSR 96-9P, 1996 WL 374185, at*3 (S.S.A. July 2, 1996) ("Jobs are sedentary if

walking and standing are required . . . [for a total of] no more than about 2 hours of an 8-hour

workday . . . [and] [s]itting would generally total about 6 hours of an 8-hour workday."); 20

C.F.R. §§ 404.1567(a), 416.967(a); *see also Poupore*, 566 F.3d at 306 ("requirement that

[claimant] get up and move around from time to time does not preclude his ability to perform

sedentary work").

        Although Plaintiff testified that she was extremely limited in daily activities, the record

reads somewhat differently.  For example, as the ALJ noted (AR 1050, 1059), Plaintiff worked

as a secretary from July to September 2019 (AR 316).  Although the ALJ found that this work

did not rise to the level of "substantial gainful activity," it may be considered in the context of

determining Plaintiff's RFC and assessing the persuasiveness of the medical opinions.  *See* 20

C.F.R. §§ 404.1571, 416.971 ("Even if the work you have done was not substantial gainful

activity, it may show that you are able to do more work than you actually did.").  Further,

although Plaintiff testified that her daily activities were essentially limited to lying in bed with

her foot elevated almost all day every day, there is evidence that she was able to help care for her

pets, wash dishes if using a chair, shop and drive on her own, and visit her mother.  (*See* AR 221–22, 253–56.)

### B.    Cognitive Limitations

Although the ALJ found Dr. Garcia's opinions about Plaintiff's physical limitations persuasive, he did not find persuasive Dr. Garcia's testimony that Plaintiff would have problems concentrating and would be occasionally sedated more than a normal patient if she was using opioids (*see, e.g.*, AR 1089).  The ALJ reasoned as follows: (1) Dr. Garcia "declined to provide any specific limitations beyond generally assuming some attention problems"; (2) Plaintiff herself denied having side effects to her medications; and (3) examinations did not show any significant cognitive deficits related to medication or otherwise.  (AR 1058.)  The ALJ did not commit legal error in finding Dr. Garcia's testimony unpersuasive regarding Plaintiff's potential concentration deficits.  *See Veino v. Barnhart*, 312 F.3d 578, 587–88 (2d Cir. 2002) (holding it is the ALJ's prerogative to resolve conflicts in the evidence by crediting only a portion of a doctor's testimony); *Vecchio v. Comm'r of Soc. Sec.*, CIVIL ACTION NO. 20 Civ. 8105 (MKV) (SLC), 2021 WL 8013772, at *15 (S.D.N.Y. Dec. 1, 2021) ("That the ALJ deemed only a portion of Dr. Antiaris's medical opinion to be persuasive . . . was not an act of impermissible cherry-picking . . . because the ALJ explained that a portion of her opinion was unpersuasive because it is inconsistent with the totality of the medical evidence of record, including the unremarkable mental status examinations." (internal citation and quotation marks omitted)), *report and recommendation adopted*, 2022 WL 873175 (Mar. 24, 2022).

Moreover, substantial evidence supports the ALJ's finding that Dr. Garcia's testimony was unpersuasive as to Plaintiff's ability to concentrate.  First, Dr. Garcia stated that he was not able to quantify the extent of Plaintiff's concentration deficiencies, and thus he did not form any opinion about concentration deficiencies particular to Plaintiff.  (*See* AR 1089 (when asked

whether he could "give a percentage of times" that Plaintiff might be off task because of concentration problems, Dr. Garcia responded "I don't want to say that she cannot do anything"); *see also* AR 1091 (Dr. Garcia acknowledging that he is unable to assess the extent of Plaintiff's "issues with concentration"). Further, as the ALJ noted, the medical record does not show "any significant cognitive deficits related to medication or otherwise" (AR 1058), but rather, documents cognitive stability and normalcy, appropriate affect, intact judgment, and full orientation. (*See, e.g.*, AR 1365, 1375, 1407, 1415, 1429, 1433, 1483.) Consistent with those normal findings, Plaintiff herself denied having concentration difficulties or any other significant side effects of her medications, stating in Function Reports that she could pay attention for a "long time" (AR 237), finish what she started (AR 257), and follow instructions "very good" (*id.*) or "pretty well" (AR 237).

As the ALJ also noted, there is no indication in the records of Plaintiff's medical appointments that she demonstrated any significant cognitive deficits or sedation related to her medication use. To the contrary, the medical record reveals that the only medication side effect Plaintiff consistently experienced was constipation, and even that was effectively controlled with a stool softener. (*See, e.g.*, AR 971, 977, 987, 694 ("no confusion . . . [or] dizziness").) Regarding other side effects, including oversedation, many medical records include the following notation indicating that Plaintiff felt none: "Side effects [of medications]? no"; "[O]versedation? no"; "Other side effect? none." (AR 971; *see also* AR 977, 982, 987, 993, 998, 1295, 1316, 1324, 1348, 1368, 1378.) These same records state that Plaintiff's medication use helped ease her pain and that her use of narcotics allowed her to "function walk." (AR 971; *see also* AR 987, 988 (tramadol and oxycodone "make[] pain better"), 1316, 1368, 1378.) The ALJ also correctly noted that Plaintiff was able to engage in several daily activities that require an ability to concentrate and stay on task—including managing her finances, reading, and playing

computer games—without experiencing concentration deficiencies.  (AR 1051–52; *see* AR 223, 235–36, 255–56.)  *See Medina v. Comm'r of Soc. Sec.*, 831 F. App'x 35, 36 (2d Cir. 2020) (affirming ALJ decision not to afford controlling weight to treating physician opinion in part because claimant's "self[-]report of her activities of daily living" showed that she was able to "independently manage reported activities of daily life, including tasks such as cooking, cleaning, self-care, banking, shopping[,] and driving without assistance"); *Rivera v. Harris*, 623 F.2d 212, 216 (2d Cir. 1980) (holding that claimant's ability to perform daily activities such as cooking, sewing, and shopping—even if she is only able to perform them slowly and she needs to "take[] an afternoon rest" thereafter—supported ALJ's determination that claimant could perform "gainful activity of a light, sedentary nature").

Accordingly, the ALJ did not err in finding persuasive Dr. Garcia's opinions about Plaintiff's physical limitations, while at the same time finding unpersuasive Dr. Garcia's general testimony about concentration deficits in patients who take opioids.[5]

The ALJ also analyzed the opinions of NP Dumas, Plaintiff's treating primary care practitioner.  (*See* AR 1058–59.)  In a December 2019 Medical Source Statement, NP Dumas opined that Plaintiff: needs to use a cane for assistance with walking (AR 1007); can lift only ten pounds occasionally and less than ten pounds frequently (AR 1008); can never stoop, crouch, kneel, crawl, balance, or climb ladders (*id.*); can climb stairs less than occasionally (*id.*); can handle, finger, and feel objects frequently (*id.*); can reach occasionally (*id.*); can sit for up to

---

[5]  The ALJ also did not err in declining to include in his RFC determination Dr. Garcia's testimony that he "would not recommend [Plaintiff] to do more than simple office work because . . . she would be at risk of injuring herself."  (AR 1088.)  Dr. Garcia did not provide an explanation for this opinion, but presumably it is based on his general opinion that long-term use of opioids "can cause disruption in concentration," along with "less accurate" mental awareness in general.  (AR 1089.)  For the same reasons that I conclude substantial evidence supports the ALJ's finding that Plaintiff does not have concentration deficiencies that would affect her ability to do sedentary work, I also conclude that substantial evidence supports a finding that Plaintiff did not have any other cognitive deficiencies that would require her to do only "simple" work.

two hours, stand for up to one hour, and walk for up to one hour (*id.*); has to take breaks to lie

down for two hours at a time (AR 1009); cannot sit, stand, or walk for two or more hours out of

eight (*id.*); has to lie down frequently because of radicular pain in her right leg (*id.*); can work at

most two to four hours per day due to pain (*id.*); is off-task twenty percent or more of the time

due to distraction from pain and narcotic medications (*id.*); and would miss four or more days of

work per month due to chronic migraines (AR 1009–10).

The ALJ found these opinions "unpersuasive" (AR 1058), stating that "the record does

not support such significant limitations" (AR 1059).  In making this finding, the ALJ properly

considered whether NP Dumas's opinions are supported and consistent with the record,

concluding that they are not supported by her own examination findings and not consistent with

other evidence in the record.  The ALJ explained: "[P]hysical examinations . . . do not include

consistent findings of leg instability, weakness, or loss of sensation"; "many examinations

showed that [Plaintiff] was able to stand and sit without difficulty and had normal motor function

in her extremities and negative straight leg raise tests"; "neither NP Dumas nor any other

providers mad[e] objective findings of distractibility, concentration deficits, or other cognitive

problems"; and "[Plaintiff] often denied those side effects from medications."  (*Id.*)  As

discussed above, although NP Dumas's treatment records referenced some range of motion

deficits in Plaintiff's back and knees, and complaints of weakness and instability, her physical

examination findings did not show consistent weakness or instability in her legs.  (*Id.*; *see, e.g.*,

AR 980, 984, 990–91, 996, 998, 1297, 1326, 1350.)  Moreover, the medical record—including

NP Dumas's own treatment notes—document that Plaintiff had no neurological deficits (*see,

e.g.*, AR 944, 984), that Plaintiff told medical providers taking narcotic medications allowed her

to "function walk" (*see, e.g.*, AR 971, 987, 998), and that Plaintiff's motor strength, reflexes, and

sensation were mostly normal (*see, e.g.*, AR 520, 695, 1513).  NP Dumas's opinions are also not

consistent with Plaintiff's own statements regarding her ability to sit and stand, as discussed above.  (*Compare* AR 1008 (NP Dumas opining Plaintiff could sit for only two hours at a time) *with* AR 250 (Plaintiff stating she could sit for up to five hours); *compare* AR 1008 (NP Dumas opining Plaintiff could stand for only up to one hour at a time) *with* AR 232 (Plaintiff stating she could stand for up to two to three hours at a time).)  Finally, NP Dumas's opinions are not consistent with the opinions of either medical expert Dr. Garcia or nonexamining agency consultants Drs. Knisely and Schumacher.

The ALJ therefore did not err in finding NP Dumas's opinions unpersuasive.  Plaintiff asks the Court to reweigh the evidence and conclude that the ALJ should have found these opinions more persuasive.  But as discussed above, where substantial evidence supports the ALJ's decision to find a medical opinion unpersuasive, the Court must regard that decision as "conclusive."  *Davila-Marrero*, 4 F. App'x at 46; *see Barrere*, 2021 WL 1590047, at *2; *see also Smith*, 740 F. App'x at 726 ("ALJ was not required to identify evidence explicitly rebutting the opinions of [claimant's] treating physicians before discounting or rejecting them").

## <u>Conclusion</u>

The ALJ applied the correct legal standard, and substantial evidence supports the ALJ's decision that Plaintiff was not disabled.  The Court therefore DENIES Plaintiff's Motion (Doc. 10), GRANTS the Commissioner's motion (Doc. 13), and AFFIRMS the decision of the Commissioner.  The Clerk shall enter judgment in favor of the Commissioner.

Dated at Burlington, in the District of Vermont, this 31st day of October 2023.


*/s/ Kevin J. Doyle*
Kevin J. Doyle
United States Magistrate Judge